[Cite as *State v. Ward*, 2026-Ohio-3113.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 115488 |
| v. | : | |
| ARIC WARD, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 13, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-25-702546-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Attorney Kimberly Kendall Corral, Inc. and Kimberly Kendall Corral, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Aric Ward ("Ward") appeals his conviction for conspiracy with purpose to commit the aggravated murder of two people along with firearm specifications

and a repeat-violent-offender specification. For the following reasons, we affirm Ward's conviction.

## I. Facts and Procedural History

{¶ 2} On June 1, 2024, Bralon Shepard ("Shepard") and Sylvon Robinson ("Robinson") were fatally shot while in a silver Jeep Grand Cherokee (the "Jeep") near E. 109th Street and Prince Avenue in Cleveland, Ohio. On June 6, 2025, Ward was indicted on 16 counts including the aggravated murders of Shepard and Robinson. Included in these counts was a charge for conspiracy, alleging that Ward conspired to commit the killing of Shepard and Robinson. Specifically, the murders at issue were drive-by shootings, and the indictment alleged that the Dodge Durango (the "Durango"), from which the fatal shots were fired, was a rental vehicle rented in Ward's name at the time of the shooting.

{¶ 3} Ward's case was tried to a jury who returned a not guilty verdict on the first 15 counts in the indictment and found Ward guilty of conspiracy in violation of R.C. 2923.01(A)(2) with a three-year firearm specification. On July 15, 2025, the court found Ward guilty of a 4.5-year firearm specification and a repeat-violent-offender specification, both attached to Ward's conspiracy conviction, and sentenced Ward to 21.5 to 27 years in prison.

{¶ 4} Ward appeals and raises the following assignments of error for our review:

> I. The grand jury indictment for Count 16 is void as it does not sufficiently allege a substantial overt act.

II. The tril [sic] court erred because the guilty verdict cannot be upheld because the evidence and testimony presented at trial is insufficient to establish appellant Ward's guilt beyond a reasonable doubt as to Count 16.

III. The trial court erred by reading erroneous jury instruction's [sic] relieved the State of its burden of persuasion, prejudiced appellant and violated appellant's due process rights.

III A. Trial counsel's failure to object to erroneous jury instruction's [sic] constituted ineffective assistance of counsel, denying appellant Ward his Sixth Amendment right to counsel and violated appellant's due process rights.

III B. The trial court committed plain error when it instructed the jury with factual conclusions supporting the State's theory and opinion testimony of appellant[']s credibility and intent, in violation of appellant's due process rights.

IV. The admission of Detective Loomis's opinion testimony about the defendant's guilt, including identification of the defendant in surveillance footage was violative of Ohio Rule of Evidence 401 and appellant[']s rights pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution.

V. Evidence that appellant Ward was in jail is violative of Ohio Rule of Evidence 401 and appellant[']s rights pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution.

VI. Appellant Ward's right to a fair trial was violated by the effect of cumulative error.

## II. Law and Analysis

### A. Indictment for Conspiracy

{¶ 5} In his first assignment of error, Ward argues that his indictment for conspiracy was fatally defective because it did not sufficiently allege a "substantial overt act." Ward did not object to his indictment in the trial court. Therefore, we review this argument for plain error. Pursuant to Crim.R. 52(B), "[p]lain errors or

defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To succeed under a plain-error standard, "the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.'" *State v. West*, 2022-Ohio-1556, ¶ 22, quoting *State v. Quarterman*, 2014-Ohio-4034, ¶ 16.

{¶ 6} R.C. 2923.01 governs conspiracy, and section (A)(2) of the statute states, in part, as follows: "No person, with purpose to commit or to promote or facilitate the commission of aggravated murder . . . shall . . . [a]gree with another person or persons that one or more of them will engage in conduct that facilitates the commission of" aggravated murder. Furthermore, R.C. 2923.01(B) states, in part, that

> [n]o person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed.

{¶ 7} Ohio courts have held that an act is overt when it is "an open act, done outwardly, without attempt at concealment, and manifesting a specific intent or design." *State v. Papp*, 68 Ohio App.2d 21, 23 (10th Dist. 1980). *See also State v. Johnson*, 2009-Ohio-220, ¶ 7 (8th Dist.) (quoting *Papp* with approval).

{¶ 8} In *State v. Childs*, 88 Ohio St.3d 194, 199 (2000), the Ohio Supreme Court held that "the plain words of [R.C. 2923.01] can produce only one conclusion:

an indictment for conspiracy requires more than a mere recitation of the exact wording of the statute defining the offense of conspiracy. . . . Clearly, this section of the Revised Code requires that the substantial, overt act not only be proved, but also alleged in the indictment." In *Childs*, the defendant was indicted for conspiracy to commit aggravated drug trafficking, and the indictment read in part that "a substantial overt act was done by each defendant or a person with whom they conspired . . . ." *Id*. at 197. This was the only allegation of an overt act in Child's indictment.

> This indictment does include language asserting that Childs or one of his co-conspirators performed a substantial, overt act after his or her entrance into the conspiracy. However, while the indictment does allege that a "substantial overt act was done by each defendant or a person with whom they conspired," it does not specifically detail any overt act done in furtherance of the conspiracy. Instead, the phrase "a substantial overt act was done" merely recites the generic words of the statute. The words of the indictment are little more than a recitation of the words of R.C. 2923.01(B), which defines the crime of conspiracy.

*Id*. at 197-198.

{¶ 9} In this case, Ward's indictment for conspiracy to commit aggravated murder specifically states as follows:

> On June 1, 2024, Aric Ward and at least two other persons agreed that one or more of them would engage in conduct that facilitated the aggravated murder of the occupants of a silver Jeep Grand Cherokee under R.C. 2903.01 subsection (A) and in Aric Ward's case also subsection (D). Said conduct involved the use of a rental car in the commission of a drive-by shooting the purpose of which was to find and kill the occupants of a silver Jeep Grand Cherokee, while Aric Ward was on post-release control after having been found guilty of the felony offense of aggravated robbery in 2015. The purpose of the conspiracy was to retaliate against the occupants of the silver Jeep Grand Cherokee for a shooting that occurred at approximately 1:59 am at the Heir Night

Club parking lot in Maple Heights, Ohio. In this shooting, an occupant of the silver Jeep Grand Cherokee fired at least one gun in the direction of Aric Ward while he occupied a red Mercedes in the club's parking lot. After the Jeep Grand Cherokee fired at Ward, Ward returned fire and then left the parking lot in the red Mercedes and others left the parking lot in Ward's rented Dodge Durango. Ward's rented Dodge Durango followed the silver Jeep Grand Cherokee and fired upon it using two separate guns at the intersection of Libby Road and Warrensville Center Road in Maple Heights at approximately 2:02 am. At approximately 2:05 am, Aric Ward dropped the red Mercedes off at a residence on Arch Street in Maple Heights, Ohio, and was picked up by another person at 2:08 am. While Ward was at this address, he purposely walked past the doorbell camera to assist in establishing a false alibi, in furtherance of his own participation in the future use of his rented Dodge Durango to kill the occupants of the silver Jeep Grand Cherokee.

At approximately 2:45 am, Ward's rented Dodge Durango, occupied by at least three persons, one of whom is believed to have been Ward using a different gun than the one he fired in the Heir Night Club parking lot, was then used by its occupants to find the silver Jeep Grand Cherokee. At that time, the silver Jeep Grand Cherokee, occupied by Bralon Shepard and Sylvon Robinson and possibly other persons, stopped at 10813 E. 109 St., just north of the intersection of E. 109 St. and Prince Avenue. Shepard and Robinson exited the vehicle and were in possession of at least two separate firearms, one of which was used to shoot at Ward in the earlier night club parking lot shooting. Ward's rented Dodge Durango proceeded eastbound on Prince through the intersection. While Ward's rented Dodge Durango proceeded through the intersection, at least seven separate guns fired at least 43 rounds between the two vehicles, killing both Shepard and Robinson. At the time of the homicides, there were at least three persons in Ward's rented Dodge Durango — a driver who fired one gun, a person standing through the sun roof firing a second gun, and a third person firing from the rear driver's side window. Two of the guns fired from the moving Dodge Durango were fired in the earlier pursuit of the silver Jeep Grand Cherokee at Libby Road and Warrensville Center Road. Ward's allowance of the use of his rented Dodge Durango to retaliate against the occupants of the silver Jeep Grand Cherokee was in furtherance of the conspiracy to commit aggravated murder. The next day, June 2, 2024, Aric Ward returned his rented Dodge Durango to the rental company. This return was earlier than the vehicle was due back to the rental company. The purpose of this early return was to make the

vehicle unavailable for police inspection, in furtherance of the conspiracy to commit aggravated murder. On October 18, 2024, Aric Ward made a statement to the Cleveland Police in which he gave false information as to the whereabouts of his rented Dodge Durango during the night club parking lot shooting and the shooting that killed Shepard and Robinson, also in furtherance of the conspiracy to commit aggravated murder.

{¶ 10} On appeal, Ward argues that his indictment for conspiracy is legally insufficient to allege a substantial overt act in furtherance of the conspiracy. Our review of Ward's indictment for conspiracy shows that the State alleged that occupants of the Jeep fired shots at Ward while he was in a red Mercedes at Heir Nightclub ("Shooting 1"). The Mercedes, along with Ward's rental Durango, left the scene. The Durango followed the Jeep, and the occupants of the Durango fired shots at the Jeep ("Shooting 2"). Shortly thereafter, Ward walked by a doorbell camera in order to, according to the State, "assist in establishing a false alibi." Approximately 40 minutes later, the Durango encounters the Jeep again and multiple shots were fired, killing Shepard and Robinson ("Shooting 3"). As expressly stated in the indictment, "Ward's allowance of the use of his rented Dodge Durango to retaliate against the occupants of the silver Jeep Grand Cherokee was in furtherance of the conspiracy to commit aggravated murder."

{¶ 11} Upon review, we find that the indictment sufficiently alleges a substantial overt act committed by Ward in furtherance of a conspiracy to commit aggravated murder. The State did not merely regurgitate the wording of R.C. 2923.01 in Ward's indictment. The indictment alleged that Ward's actions of 1) allowing people to use the Durango to follow the Jeep and ultimately kill the Jeep's

occupants and 2) appearing on a security camera at approximately the same time as the acts of Shooting 2 were done openly, without attempt at concealment, and they manifested the purpose of completing the conspiracy.

{¶ 12} Accordingly, Ward has failed to show plain or obvious error and his first assignment of error is overruled.

## B. Sufficiency of the Evidence

{¶ 13} In his second assignment of error, Ward argues that "[a]t no time does the state present any evidence which establishes or permits an inference that the parties reached any kind of agreement to commit aggravated murder." Ward also argues that the State failed to present evidence of an "overt act" needed to establish a conspiracy. Specifically, Ward argues that, assuming there was evidence that he "allowed the use of his rented Durango," this occurred prior "to any alleged agreement by Ward to engage in retaliatory murder" and could not be part of a conspiracy.

{¶ 14} As stated previously in this opinion, to prove a conspiracy under R.C. 2923.01(A)(2), the State was required to present evidence that Ward agreed with another person or persons "that one or more of them will engage in conduct that facilitates the commission of" aggravated murder.

{¶ 15} The trial transcript reflects that two sections of the aggravated murder statute are implicated in this case. Pursuant to R.C. 2903.01(A), "No person shall purposely, and with prior calculation and design, cause the death of another . . . ." and pursuant to R.C. 2903.01(D), "No person who is under detention as a result of

having been found guilty of or having pleaded guilty to a felony . . . shall purposely cause the death of another." It is undisputed that somebody fatally shot Shepard and Robinson during a drive-by-shooting. Additionally, at trial the parties stipulated that, at the time of the murders in this case, Ward was "under detention" for a prior felony conviction.

{¶ 16} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the State has met its burden of production at trial. *State v. Hunter*, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). Whether the evidence is legally sufficient to support a verdict is a questions of law. *Thompkins* at 386.

{¶ 17} "An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt." *State v. Balinski*, 2022-Ohio-3227, ¶ 43 (8th Dist.). *See also State v. Bankston,* 2009-Ohio-754, ¶ 4 (10th Dist.) ("[I]n a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the State's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.").

{¶ 18} Additionally, Ohio courts have consistently held that "[p]roof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Zadar*,

2011-Ohio-1060, ¶ 18, citing *State v. Nicely*, 39 Ohio St.3d 147 (1988). "Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." *State v. Johnson*, 2008-Ohio-1716, ¶ 62 (8th Dist.).

{¶ 19} Initially, Ward argues there was no evidence that he entered into an agreement, and there is no evidence of "any communication between Ward and the unknown occupants of the" Durango.

{¶ 20} Ward next argues that, assuming arguendo the State presented sufficient evidence of an agreement, the State still did not present sufficient evidence of a conspiracy. In *State v. McFarland*, 2020-Ohio-3343, ¶ 48, the Ohio Supreme Court held that the conspiracy statute "requires that the overt act occur after the accused entered into the conspiracy." On appeal in this case, Ward argues that the evidence showed "the occupants of the . . . Durango were allowed to occupy it prior to the Heir Nightclub shooting . . . ." According to Ward, this necessarily shows that the overt act of using the Durango occurred prior to the agreement to commit retaliatory aggravated murder. We disagree with Ward's argument.

{¶ 21} Ohio courts have held that the State may prove conspiracy through circumstantial evidence. *See, e.g., State v. Carter*, 1993 Ohio App. LEXIS 1957, *7 (3d Dist. Apr. 6, 1993) ("Participation in a criminal conspiracy need not be proven by direct evidence. . . . Purely circumstantial evidence may be sufficient to sustain a conspiracy conviction providing that the totality of the evidence is substantial enough to support a finding of guilty beyond a reasonable doubt."); *Szuch v. King*,

2010-Ohio-5896, ¶ 121 (6th Dist.) ("[M]utual consent need not be based on express agreement, for any conformance to an agreed or contemplated pattern of conduct will warrant an inference of conspiracy. . . Nor is an exchange of words required. . . Not only action, but even a lack of action, may be enough from which to infer a . . . conspiracy."); *State v. Wilkinson*, 2014-Ohio-5791, ¶ 29-31 (8th Dist.) (finding that "the circumstances . . . surrounding the delivery" and receipt of a package "allowed the factfinder to reasonably conclude" that the defendant "received the package with knowledge that it contained illegal narcotics" and was part of the conspiracy).

{¶ 22} Upon review, we find the evidence at trial demonstrated that immediately after Shooting 1 at Heir Nightclub, Ward left the scene in the Mercedes and unknown persons left the scene in the Durango and followed the Jeep. Shooting 2 occurred when the Durango caught up with the Jeep at an intersection. Meanwhile, Ward went to a house in the Mercedes and walked in front of the doorbell camera within minutes of when Shooting 2 occurred. Moments later, Ward was picked up by an unidentified vehicle. Approximately 40 minutes later, the Durango again encountered the Jeep and Shooting 3 occurred, this time resulting in Shepard's and Robinson's deaths. According to the evidence, the Durango was a rental vehicle listed in Ward's name and Ward's DNA was in the vehicle. Ward returned the Durango on June 2, 2024, one day after the shooting, which was earlier than expected and before the police could inspect it. From this circumstantial evidence, a jury could infer that Ward conspired with the occupants of his rental Durango to commit the retaliatory murders of Shepard and Robinson.

**{¶ 23}** Accordingly, we find sufficient circumstantial evidence to support Ward's conviction for conspiracy, and his second assignment of error is overruled.

### C. Jury Instructions

**{¶ 24}** In his third assignment of error, Ward argues that the court's jury instructions regarding conspiracy in this case improperly "relieve[d] the state of its burden of persuasion" and violated his due process rights. Specifically, Ward argues that "the trial court offered conclusions to the jury, not framed as state's allegations but as fact, which had the effect of prejudicially invading the province of the jury with regarding inferences, factual conclusions, and credibility assessments exclusively reserved for the fact-finder." Ward did not object to the jury instructions in this case. Therefore, we review this argument for plain error.

**{¶ 25}** Somewhat confusingly, Ward also sets forth assignments of error IIIA and IIIB. In IIIA, Ward argues that "trial counsel's failure to object to erroneous jury instruction's constituted ineffective assistance of counsel, denying appellant Ward his Sixth Amendment right to counsel and violated appellant's due process rights." Ward's entire argument under IIIA follows:

> Here, there is no strategic benefit in failing to object when the trial court offers a summary of the state's theory of the evidence as fact and offering opinion as to the Court[']s conclusion of Appellant[']s intent, his lack of credibility, and his criminal purpose during jury instructions and trial counsel[']s failure to protect Appellant's due process rights from an unconstitutional infringement by the trial court as to this sole count. The prejudice is evidenced by the fact that the only conviction against Appellant arose from the count plagued by unconstitutional jury instruction.

In IIIB, Ward argues that we must apply a plain-error standard of review to this assignment of error because trial counsel failed to object to the jury instructions.

{¶ 26} As noted, we apply a plain-error standard of review to Ward's third assignment of error because his trial counsel did not object to the jury instructions regarding the conspiracy charge. We disregard any argument concerning ineffective assistance of counsel under App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it . . . fails to argue the assignment separately in the brief, as required under App.R. 16(A).).

{¶ 27} *Ohio Jury Instructions* ("OJI") CR § 523.01 governs conspiracy, and it states, in part pertinent to this appeal, as follows:

> The defendant is charged with conspiracy. Before you can find the defendant guilty, you must find beyond a reasonable doubt, that on [DATE] and in [CUYAHOGA] County, Ohio, the defendant, with purpose to facilitate the commission of the offense of aggravated murder agreed with another person or persons that one or more of them would engage in conduct which facilitated the commission of such offense.

{¶ 28} The OJI for conspiracy also states that the instructions should include the definition of "purposely" and the elements of the principal offense, which is aggravated murder in this case.

{¶ 29} Additionally, the OJI for conspiracy includes the following:

> A conspiracy is agreeing with one or more other persons that one or more of them will engage in conduct with a purpose to facilitate the commission of the specific offense.

> A person cannot be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is proved to have been done by the defendant or by a person with whom the defendant conspired and that such act was performed subsequent to the defendant's entrance into

the conspiracy. An overt act is substantial when it is of such character as to manifest a purpose on the part of the actor that the object of the conspiracy should be completed.

If the defendant knew or had reasonable cause to believe that a person, with whom the defendant conspired, had also conspired or was conspiring with another person to commit the same offense, then the defendant is guilty of conspiring with such other person, even though the identity of such other person was unknown to the defendant.

{¶ 30} In this case, the court instructed the jury regarding conspiracy as follows:

Defendant, Aric Ward, is charged in Count Sixteen of the indictment with conspiracy, in violation of section 2923.01(A)(2).

Before you [] find the defendant guilty of conspiracy, you must find beyond a reasonable doubt that on or about June 1st of 2024, through October 18th of 2024, in Cuyahoga County, Ohio, the defendant did, with purpose to commit or promote or facilitate the commission of aggravated murder, agree with another person or persons, unknown persons one and/or two, that one or more of them would engage in conduct that would facilitate the commission of the specific offense, to-wit:

On June 1st, 2024, Aric Ward and at least two other persons agreed that one or more of them would engage in conduct that facilitated the aggravated murder of the occupants of a silver Jeep Grand Cherokee under Revised Code section 2903.01(A), and in Aric Ward's case —

. . .

So you will need to find that on June 1st of 2024, Aric Ward and at least two or [more] persons agreed that one or more of them would engage in conduct tha[t] facilitated the aggravated murder of the occupants of the silver Jeep Grand [Cherokee], under Revised Code section 2903.01(A), as in Count One and Two, and also, it's 2903.01(D), which is in Counts Three and Four. . . .

Said conduct involved the use of a rental car in [the] commission of a drive-by shooting. The purpose of which was to find and kill the occupants of a silver Jeep Grand Cherokee, while Aric Ward was on post-release control after having been found guilty of a felony offense.

The purpose of the conspiracy was to retaliate against the occupants of the silver Jeep Grand Cherokee for a shooting that occurred at approximately 1:59 a.m. at the Heir Nightclub parking lot in Maple Heights, Ohio. In this shooting, the occupants of the silver Jeep Grand Cherokee fired at least one gun in the direction of Aric Ward while he occupied a red Mercedes and others left the parking lot in Ward's rented Dodge Durango.

. . .

Ward's rented Dodge Durango followed the silver Jeep [G]rand Cherokee and fired upon it using two separate guns at the intersection of Libby Road and Warrensville Center Road at approximately 2:02 a.m.

At approximately 2:05 a.m., Aric Ward dropped the red Mercedes off at his residence on Arch Street in Maple Heights, Ohio, and was picked up by another person at 2:08 a.m. While Ward was at this address, he purposely walked past the doorbell camera to assist in establishing a false alibi, in furtherance of his own participation in the future use of his rented Dodge Durango to kill the occupants of the silver Jeep Grand Cherokee.

At approximately 2:45 a.m., Ward's rented Dodge Durango, occupied by at least three persons, one of which is believed to have been Ward using a different gun than the one he fired at the Heir Nightclub parking lot, was then used by its occupants to find the silver Jeep Grand Cherokee. At that time, the silver Jeep Grand Cherokee, occupied by Bralon Shepard and Sylvon Robinson, and possibly other persons, stopped at 10813 East 109th Street, just north of the intersection of East 109th Street and Prince Avenue.

Shepard and Robinson exited the vehicle and were in the possession of at least two separate firearms, one of which was used to shoot at Ward in the earlier nightclub parking lot shooting.

Ward's rented Dodge Durango proceeded eastbound on Prince through the intersection. While Ward's rented Dodge Durango proceeded through the intersection, at least seven separate guns fired at least 43 rounds between the two vehicles killing both Shepard and Robinson.

At the time of the homicides, there were at least three persons in Ward's rented Dodge Durango; a driver, who fired one gun, a person standing through the sunroof firing a second gun, and a third person from the

rear driver's side window. Two of the guns fired from the moving Dodge Durango were fired in the earlier pursuit of the silver Jeep Grand Cherokee at Libby Road and Warrensville Center Road. Ward's allowance of the use of his rented Dodge Durango to retaliate against the occupants of the silver Jeep Grand Cherokee was in furtherance of the conspiracy to commit aggravated murder.

The next day, June 2, 2024, Aric Ward returned his rented Dodge Durango to the rental company. This return was earlier than the vehicle was due back to the rental company. The purpose of this early return was to make the vehicle unavailable for police inspection in furtherance of the conspiracy to commit aggravated murder.

On October 18 of 2024, Aric Ward made a statement to the Cleveland Police in which he gave false information as to the whereabouts of his rented Dodge Durango during the nightclub park[ing] lot shooting and the shooting that killed Shepard and Robinson, also in furtherance of the conspiracy to commit aggravated murder.

Furthermore, and one of the objects of the conspiracy was aggravated murder, murder, or an offense for which the maximum penalty was imprisonment for life.

The term purpose has previously been defined as it relates to the charge of aggravated murder and murder in Counts One through Four.

The elements of aggravated murder have previously been defined in Counts One through Four.

Purpose to conspire in the planning or aiding in the commission of an offense with one or more persons is an essential element of the crime of conspiracy.

A person acts purposely when it is his specific intention to cause a certain result or engage in conduct of a certain nature. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to commit a criminal offense.

Whether the central idea, essence of gists of the offense is a prohibition against of a certain nature, regardless of what the person intended to accomplish thereby, if it was the person's specific intent to engage in conduct of that nature.

Purpose is a decision of the mind to do an act with a conscious intent to produce a specific result, or engaging in specific current. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing.

The purpose with which a person does an act is known only to that person, unless he expresses it to others or indicates it by his conduct.

The purpose with which a person does an act or brings about a certain result is determined from the manner in which it is done, the means or weapon used and all other facts and circumstances in evidence.

. . .

You may infer a purpose to cause the death of another where the natural or probable consequence of the defendant's act is to produce death in light of all the surrounding circumstances. Such circumstances include the weapon used and its capability to destroy life. If you find that the defendant used a deadly weapon against another in a manner calculated to destroy life, the purpose to cause death may be, but is not required to be, inferred from the use of the weapon. Whether an inference is made rests entirely upon you.

The term motive has been previously . . . defined and that same definition applies here.

A conspiracy is the planning or aiding in the planning of the commission of an offense with one or more persons agreeing with one or more persons that one or more of them will engage in conduct with a purpose to commit, promote, or facilitate the commission of the specific offense.

A person cannot be convicted of conspiracy unless a substantial overt act in the furtherance of the conspiracy is proved to have been done by the defendant, or by a person with whom the defendant conspired, and that such act was performed subsequent to the defendant's entrance into the conspiracy.

An overt act is substantial when it is of certain character as to manifest a purpose on the part of the actor that the object of the conspiracy should be completed. If the person knew or had reasonable cause to believe that a person with whom the defendant conspired had also conspired or was conspiring with another person to commit the same offense, then the defendant is guilty of conspiring with such other

person, even though the identity of such other person was unknown to the defendant.

If you find that the State has proved beyond a reasonable doubt each and every one of the essential elements of the offense of conspiracy as charged in Count Sixteen of the indictment, your verdict must be guilty according to your finding. You will then indicate your findings on the verdict form.

If you find that the State has failed to prove beyond a reasonable doubt any one of the essential elements of the offense of conspiracy as charged in Count Sixteen of the indictment, your verdict must be not guilty according to your findings. You will then indicate your findings on the verdict form.

{¶ 31} Under this assignment of error, Ward cites *State v. Wade*, 53 Ohio St.2d 182, 188 (1978), in which the Ohio Supreme Court set forth factors which appellate courts are to consider when determining whether a trial court's remarks are prejudicial:

(1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.

Ward cites no case law applying the *Wade* test to jury instructions. Our research revealed no such cases. We decline to apply *Wade* to this situation. Rather, the test to apply here is found in *State v. Adams*, 2004-Ohio-5845, ¶ 97, which states as follows: "Due process requires the state to prove beyond a reasonable doubt every element of the charged offense. . . . Jury instructions that effectively relieve the state of its burden of persuasion violate a defendant's due process rights."

{¶ 32} A review of Ward's appellate brief shows that he takes issue with the court's jury instruction regarding conspiracy for the following reasons:

> Nowhere in this instruction does the Court state that it is reciting the state's theory, nor does the court admonition that the facts, conclusions and opinions are merely allegations. Rather, the weight of the court's influence states, as fact, to the jury that Ward, among other things, purposely created a false alibi, that he intentionally hindered police inspection, and that he gave false information to police.

{¶ 33} Ward's characterization of the court's conspiracy jury instruction is simply not true. While the court's jury instruction regarding conspiracy was unusually long and detailed, one of the first things the court stated to the jury was, "Before you [] find the defendant guilty of conspiracy, you must find beyond a reasonable doubt that . . . ." Subsequently, the court reminded the jury of this concept by stating, "So you will need to find that . . . ."

{¶ 34} Following these overarching instructions regarding the State's burden at trial, the court went into great detail about what exactly the jury would need to find in order to conclude that Ward was guilty of conspiracy. The court concluded the conspiracy instruction by stating that if the jury finds the State proved the elements of conspiracy beyond a reasonable doubt, its verdict must be guilty, and if the jury finds the State failed to prove the elements of conspiracy beyond a reasonable doubt, its verdict must be not guilty. In summary, the court expressly instructed the jury about the conspiracy elements it would need to find in order to find Ward guilty of the offense.

{¶ 35} In *Adams*, the defendant challenged a jury instruction that stated, in part, as follows: "'[to] find the Defendant guilty . . . you must find that the State has proven beyond a reasonable doubt that the Defendant . . . did purposely cause the death of Ashley Dawn Cook, age 12, who was under 13 years of age at the time of the [murder.]'" *Id*. at ¶ 99. According to the defendant in *Adams*, "the trial judge in effect instructed the jury that Ashley was in fact 12 years old, when the jury had the responsibility to make a finding of fact on that issue." *Id*.

{¶ 36} The Ohio Supreme Court found that this "instruction did not foreclose the jury's role." *Id*. at ¶ 101.

> The reference to Ashley as "age 12" came in the context of the trial court's instructions to the jury as to the charge as stated in the indictment. The court then properly instructed the jury that the state had to prove the victim's age. When considered in the context of the entire instructions, the jury would not have understood the instruction as requiring it to accept that Ashely was 12 years old, without making the required factual finding.

*Id*.

{¶ 37} We find this case to be similar to *Adams*. Looking at the court's jury instructions as a whole, the jury would not think that the court was stating as fact, rather than allegation, that Ward "purposely created a false alibi, that he intentionally hindered police inspection, and that he gave false information to police." In other words, the court did not usurp the jury's role as factfinder. Therefore, Ward has failed to show that the court committed plain error by instructing the jury on conspiracy in the manner it did.

{¶ 38} Accordingly, Ward's third assignment of error is overruled.

**D. Opinion Testimony**

{¶ 39} In his fourth assignment of error, Ward argues that the admission of Cleveland Police Detective Stephen Loomis' ("Loomis") opinion testimony violated Evid.R. 401 and his constitutional rights under the Fifth, Sixth and Fourteenth Amendments. Ward did not object to this testimony at his trial. Therefore, we review this argument for plain error.

**1. The Testimony at Issue**

{¶ 40} Specifically, Ward argues that Loomis' identification of Ward from surveillance videos was inadmissible opinion testimony. Ward does not quote the challenged testimony. Rather, he cites pages 1049, 1051 and 1053 of the trial transcript. Our review of this portion of Loomis' trial testimony shows that the following colloquy took place regarding Loomis' identification of Ward:

Q:     Did you obtain this video from the Budget Rental Place?

A:     Yes, sir. Mr. Jimison provided it to us.

Q:     The individual we see in this video, is that individual in the courtroom today?

A:     Yes, sir, he is.

Q:     And I would like you to please point to that person who's in the courtroom and describe what he's wearing for the Judge.

A:     He is sitting over to the right side with a three piece suit on and long braids.

{¶ 41} The court noted on the record that Loomis identified Ward as the person in the video. Loomis testified about a second and third video from the rental

car location that showed a different angle of the establishment and he, again, identified Ward in the videos.

{¶ 42} Ward also argues that unquoted testimony found on page 1044 of the trial transcript was inadmissible because it was Loomis' opinion. Specifically, Ward's appellate brief states as follows: "Further, Det. Loomis offers evidence of his impressions and interpretations of surveillance videos by narrating his impression opinions to the jury." Our review of page 1044 of the trial transcript shows that Loomis did not give his opinion on anything at all, let alone a video, during this portion of his testimony. Rather, Loomis testified that the day after the homicide, police recovered surveillance video from a church near the crime scene and from this video police identified a suspect vehicle.

{¶ 43} Next, Ward argues that unquoted testimony found on page 1127 of the trial transcript was inadmissible for the following reason: "Det. Loomis also restates what he hears in Appellant Ward's interview, then offers testimony as to what he believes Ward implied through his questions and responses. On cross, Loomis admits these are his interpretations, not direct admissions by Ward." Again, our review of page 1127 of the trial transcript does not match what Ward argues in his appellate brief. At this point in the trial, Loomis testified about his video interview of Ward, but at no point on page 1127 does his testimony reflect his interpretation of anything. We also reiterate that Ward's appellate brief does not quote the testimony that he challenges on appeal.

{¶ 44} Having identified what we believe is the testimony being challenged by Ward, we turn to its admissibility.

## 2. Relevancy Under Evid.R. 401

{¶ 45} Evid.R. 401 states that relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pursuant to Evid.R. 402, relevant evidence is generally admissible.

{¶ 46} Despite Ward's fourth assignment of error stating that Loomis' testimony violated Evid.R. 401, Ward makes absolutely no argument on appeal that any of Loomis' testimony was irrelevant to the charges Ward faced at trial. Therefore, we disregard Evid.R. 401 in our analysis.

## 3. Constitutional Challenges

{¶ 47} Ward argues that opinion testimony of a police officer about a defendant's guilt is inadmissible. Ward cites *State v. Battiste*, 2015-Ohio-3586, ¶ 35-36 (8th Dist.) and *State v. Brunson*, 2020-Ohio-5078, ¶ 34 (8th Dist.) to support this argument. Specifically, Ward argues that the admission of this opinion testimony violated his constitutional rights under the Fifth, Sixth and Fourteenth Amendments. Our review of *Battiste* and *Brunson* shows that neither case decided an admissibility of opinion testimony issue under the Fifth, Sixth or Fourteenth Amendments to the Constitution.

{¶ 48} In *Battiste*, the police detective referred to the defendant as the person "who did it" in her trial testimony. *Battiste* at ¶ 39. Battiste's counsel also

failed to object to this line of testimony, and this court reviewed for plain error. *Id.* at ¶ 38. This court found that, "read in the context of [the detective's] entire testimony, we are unable to conclude that [the detective] was offering an opinion as to the truthfulness of [the victim's] accusations or to the guilt or innocence of Battiste." *Id.* at ¶ 39. In other words, this court found that the testimony at issue was not an opinion. *Id.* As a result, this court found no plain error. *Id.*

{¶ 49} In *Brunson*, the police detective testified that "she had obtained height and weight information for each of the defendants upon their arrests," and "using those physical characteristics to review the surveillance footage of the suspects, she was able to form an opinion that suspect one was Brunson." *Brunson* at ¶ 32. Brunson's trial counsel objected to this testimony. *Id.* On appeal, Brunson argued that "this testimony violates Evid.R. 701 and constitutes both improper vouching of the state's case and opinion testimony of guilt, which robs the jury of its fact-finding function." *Id.* at ¶ 33. In *Brunson*, this court established that Evid.R. 701 stands for the proposition that "opinion testimony of a police officer about the guilt of a defendant is inadmissible." *Id.* at ¶ 34. Ward did not cite Evid.R. 701 in his merit brief or reply brief on appeal, and we will not consider it in our analysis.

{¶ 50} The *Brunson* Court found that the police detective's "identification of 'suspect one' in the surveillance footage of the incident as Brunson was improper opinion testimony," but also noted that "it is not erroneous for a law enforcement officer to testify that they identified the defendant as a suspect . . . ." *Id.* at ¶ 35. This court further concluded that the admission of this testimony constituted harmless

error" because the State also introduced cell phone records, DNA evidence and witness testimony that supported Brunson's convictions. *Id*. at ¶ 37.

{¶ 51} Ward's brief does not cite the language of the Fifth, Sixth or Fourteenth Amendments to the U.S. Constitution, nor does it argue how Loomis' testimony may have violated his rights under these constitutional provisions. This court has repeatedly held that "[w]e are not obliged to scour the record in search of evidence to support an appellant's assignment of error. . . . Nor is it our duty to search for law in support of an appellant's argument on appeal." *Mayfair Vill. Condo. Owners Assn. v. Grynko*, 2013-Ohio-2100, ¶ 6 (8th Dist.).

{¶ 52} While we are aware that a police officer's opinion testimony about the guilt of a defendant is inadmissible under Evid.R. 701, Ward fails to point to, and we find, no such testimony at his trial. Ward has failed to identify a plain error in the admission of Loomis' testimony.

{¶ 53} Accordingly, Ward's fourth assignment of error is overruled.

### E. Evidence that Ward was Incarcerated

{¶ 54} In his fifth assignment of error, Ward argues that evidence that he was incarcerated violated Evid.R. 401 and his constitutional rights under the Fifth, Sixth and Fourteenth Amendments. Ward does not explain or even identify the evidence admitted at his trial that formed the basis of this argument. Rather, his appellate brief refers to "witness testimony and counsel's statement's regarding Ward's incarceration at the jail" and cites to page 1107 of the trial transcript. Our review of page 1107 of the trial transcript reveals the following testimony that could possibly

apply to this argument.  The exchange is between the prosecutor and Loomis, and it occurred while the jury was watching a video of Loomis' interview of Ward.

Q:  Are the officers here to take him to court?

A:  Yes, sir, they are.

Q:  Okay.  Thank you.

{¶ 55} To support his argument that this testimony was improper, Ward cites *State v. Collins*, 2008-Ohio-3016, ¶ 14-18 (8th Dist.), *State v. Robinson*, 2013-Ohio-4375, ¶ 74 (8th Dist.) and *State v. Graffius*, 2019-Ohio-2714, ¶ 34-35 (7th Dist.).

{¶ 56} In *Collins*, the trial court told a prospective jury pool during voir dire that the defendant was incarcerated, and they would not see him in the cafeteria for lunch.  *Id*. at ¶ 11.  The trial court added, "I just want you to know that for security purposes."  *Id*.  After the comments, defense counsel moved for a mistrial, which the trial court denied.  On appeal, this court found that the trial court "compounded the problem exponentially by adding that it was for 'security purposes.'"  *Id*. at ¶ 17.  This court reversed Collins' convictions and remanded the case for a new trial.

{¶ 57} In *Robinson*, a child-witness "made a fleeting reference to Robinson being 'in prison' while answering the prosecutor's question regarding the nature of the conversations that she had with Robinson following the shooting."  *Id*. at ¶ 73.  This court found "a distinct difference from a comment made by the judge in *Collins* . . . — a person whose position alone carries considerable credibility and weight in the eyes of a jury — to an unresponsive, fleeting comment made by a teenager."  *Id*.

at ¶ 74. The *Robinson* Court concluded that failure to give a curative instruction following this testimony amounted to harmless error. *Id.*

{¶ 58} In *Graffius*, the testimony in question "arose during the victim's testimony. On direct examination, the state asked the victim whether she was afraid after the incident, to which she replied: 'I mean, I'm not fearful, because I know he's in jail, but I mean, that whole summer, when he was not, I didn't leave my house except to go to work.'" *Id.* at ¶ 34. the court stated that "Ohio courts have held that a single isolated comment that defendant is jailed is not enough to demonstrate prejudice." *Id.* at ¶ 36. "When there is no reasonable probability that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal." *Id.*

{¶ 59} Upon review, we find that the testimony at issue in Ward's trial is similar to the testimony at issue in *Robinson* and *Graffius*. Loomis' fleeting statement that officers were there to take Ward to court is isolated, and Ward failed to show how the admission of this testimony prejudiced him. Indeed, Ward's entire argument concerning the allegedly improper testimony in his case is as follows: "The admission of evidence that Ward was in jail were [sic] improper, were [sic] prejudicial and warrant reversal."

{¶ 60} Ward failed to establish plain error and his fifth assignment of error is overruled.

### F. Cumulative Error

{¶ 61} In his sixth and final assignment of error, Ward argues that his "right to a fair trial was violated by the effect of cumulative error."

{¶ 62} "Pursuant to the doctrine of cumulative error, a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Houston*, 2018-Ohio-3043, ¶ 41. To reverse for cumulative error, courts must first find that multiple errors were committed at trial and then find "a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors." *Id.* at ¶ 42.

{¶ 63} When the court finds no error or harmless error in the trial court, the cumulative error doctrine does not apply on appeal. *State v. Brown*, 2003-Ohio-5059, ¶ 48. *See also State v. Allen*, 2016-Ohio-102, ¶ 53 (8th Dist.) ("[T]he doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent.").

{¶ 64} We find that the cumulative error doctrine does not apply to Ward's case because we did not find multiple errors committed at trial. Accordingly, Ward's sixth assignment of error is overruled.

{¶ 65} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

TIMOTHY W. CLARY, J., CONCURS;
SEAN C. GALLAGHER, P.J., CONCURS (WITH SEPARATE OPINION)


SEAN C. GALLAGHER, P.J., CONCURRING:

{¶ 66} Although I concur with the majority, there are a couple issues that warrant further explanation for my decision.

{¶ 67} Ward's appellate argument is twofold. He focuses on the apparent inconsistency in the jury acquitting him of being the principal offender for the murder- and assault-related charges, and in addition, the claim that there could be no conspiracy because the State failed to present express evidence of any communication between Ward and the other shooters before the final shooting.

{¶ 68} The State's trial theory rested on demonstrating that Ward participated in the shooting that directly led to the death of the victims as a co-conspirator. The State presented evidence that Ward was the shooter standing in the moonroof of his rented Durango used in the criminal endeavor and every step Ward took that evening was to achieve the conspiratorial ends. Although the jury

acquitted Ward for the direct murder- and assault-related offenses, that does not preclude a finding of guilt for conspiracy to commit murder even if the factual predicate is the same. The jury is permitted to consider the same evidence and reach differing conclusions as between different counts of an indictment even if there is overlap between the elements of the crimes as charged. This is because under established Ohio law, "'[t]he several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count.'" *State v. Adams*, 53 Ohio St.2d 223 (1978), paragraph two of the syllabus; *State v. Ford*, 2019-Ohio-4539, ¶ 347.

{¶ 69} Ward fails to address that case authority in which inconsistent verdicts are not grounds for reversal of the conviction despite his argument's heavy reliance on a proposition of law to the contrary. If *Adams* is to be disavowed, it will be up to the Supreme Court to do so. We are bound by that precedent until told otherwise.

{¶ 70} As to Ward's second point, it is acknowledged that the police failed to get Ward's phone number to retrieve his data/call records in an effort to prove communication with the other shooters. Ward destroyed his phone before his arrest, strongly implying Ward was aware that damaging information could have been retrieved from the phone. Although the State attempted to explain that limitation in its investigation, the lack of an attempt to subpoena the phone records was never addressed. The State's explanation was limited to the destruction of the

internal GPS monitoring hardware in the destroyed phone. The lack of investigation into the phone records muddied the evidentiary waters and opened the door to Ward's appellate argument.

{¶ 71} Nevertheless, the State's theory focused on Ward's active participation in the substantive act in furtherance of the conspiracy, the final shooting that resulted in the death of the two victims. Express communications detailing the scope of the conspiracy are not necessary when the allegations accepted by the trier of fact include the defendant's active participation in the conspiratorial efforts, which included the finding of guilt on the firearm specifications that were entirely based on the final shooting.

{¶ 72} For these reasons and those presented by the majority, I concur with affirming Ward's conviction.